jSTicholsojST, C. J.,
delivered the opinion of the Court.
About the 1st of June, 1866, M. H. Martin conveyed all of his real estate, consisting of two tracts, one of two hundred, and the other of sixty acres, to his two sons, Joseph PI. Martin and Madison Martin. The tract for 200 acres was conveyed to James H., for the consideration of one dollar, and in consideration that Joseph H., executed a bond in the penalty of $2,000 for the support of his father during his life. The tract of 60 acres was conveyed to Madison for the consideration of love and affection. A-t the time of these conveyances, the said M. H. Martin had a wife, two daughters, and a number of grand-children, who, as well as Joseph H. and Madison, survived him. In August, 1866, the said M. H. Martin died. Soon *646 after his death, his widow filed her bill for' dower in the said lands, alleging that the conveyances were made to defeat her right of dower; and dower was allotted to her. Afterward, in May, 1869, this bill was filed by complainants, who are heirs of M. H. Martin, to set aside the conveyance aforesaid, for fraud.
The allegations of the bill are, that M. H. Martin was seventy-six years of age, enfeebled in body and and mind, as well by disease as by old age; harassed and disturbed, in consequence of a recent separation from a second wife, to whom he had been but lately married; and that defendants, Joseph H. and Madison, took advantage of his weakness of mind and his domestic trouble, and procured him, by undue influence and fraudulent devices, to execute the conveyances. With evident indications of hesitancy and evasiveness, the main allegations of the bill are denied.
It is well settled that weakness of understanding must constitute a most material ingredient in examining whether a bond or .other contract has been obtained by fraud or imposition, or undue influence; for although a contract made by a man of sound mind and fair understanding may not be set aside merely from its being a rash, improvident or hard bargain, yet if the same contract be made with a person of weak understanding, there arises a natural inference that it was obtained by circumvention or undue influence. 1 Story Eq., § 235. The doctrine, therefore, may be laid down as generally true, that the acts and contracts of persons who are of weak understanding, and who are thereby liable to imposition, will be held void in courts of- equity, if the nature of *647 the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but has been imposed upon, circumvented or overcome with cunning, or undue influence. Ib., § 238. In all cases of principal and agent, the former contracts for the aid and benefit of the skill of the latter;, and the habitual confidence reposed in the latter makes all his acts and statements possess a commanding influence over the former. It is, therefore, for the common security of all mankind, that gifts procured by agents, and purchases made by them from their principals, should be scrutinized with a close and vigilant suspicion. Agents can not deal validly with their principals in any cases except where there is the most entire good faith and a full disclosure of all facts and circumstances, and an absence of all undue influence, advantage or imposition. § 315; 1 Cold., 290; 6 Cold., 440; 8 Hum., 145; 2 Head, 289; 6 Vesey, 268; 9 Vesey, 292; 8 Hum., 183.
In determining the validity or invalidity of the conveyances attacked in the bill, we must be governed by the principles of equity jurisprudence just laid down. The record exhibits to us a transaction between father and sons. The father is seventy-six years of age. He has been the victim of rheumatism and dyspepsia for years. Eccentric to an extent that approaches lunacy, and subject to spasmodic attacks, which for the time, rendered him helpless and insensible. At the advanced age of seventy-five he marries a second wife, and in a short time domestic troubles arise which result’ in their separation. He is the owner of two hundred and sixty acres of land, and he has two sons, two daughters and *648 several grand-children, the children of his deceased sons or daughters. Soon after his separation from his 'wife, harrassed and troubled in mind, whilst greatly enfeebled by age and disease, he conveys his entire real estate to his two sons, to the exclusion of his wife, his daughters and his grand-children. No reason whatever is given for thus cutting off his wife, though his object in so doing may be readily inferred from the fact that he had just separated from her. It does not appear that his natural affections had been in any degree alienated from his daughters or from the children of his deceased sons and danghters. Nor does it appear that he had any special cause for selecting his two sons as the sole objects of his bounty. We find in the record no explanation of this apparent disregard of the natural affections. Being the- absolute owner of the property, M. H. Martin had the absolute right to dispose of it as he pleased, anjj none have a legal right to object or complain, provided he was at the time possessed of a sound disposing mind, and was free to act without fraud or undue influence.
This brings us to the controling question: Did M. H. Martin, being of sound and disposing mind, execute the deeds freely and understandingly, or was he at the time impelled to make the conveyance by the fraud or undue influence of defendants, Joseph H. and Madison, or either of them?
We have no difficulty in seeing that the leading object of M. H. Martin, and of Joseph H. and Madison, was to defeat the wife of M. H. Martin in any claim to said lands, either by way of alimony or dower. It appears *649 from the record, that immediately after the conveyances •were made, the wife of M. H. Martin filed her bill for divorce and for alimony;' that pending the suit the said M. H. Martin died, and that, upon the filing of an amended bill and the proper proceedings had, the Chancellor set aside the deeds, and allotted .to the widow dower in the lands. In pronouncing his- decree, the Chancellor states that, “it appearing to the Court that complainant and said M. H. Martin lived and cohabited together as husband and wife, happily, until their connubial harmony was marred by the contrivances of the defendant, Joseph H. Martin; and that said contrivances culminated in the conveyance of the said M. II. Martin, to his sons, Joseph II. and Madison, of his entire real estate,” thereupon he held that the conveyances were in fraud of the widow’s dower right.
But it does not necessarily follow that because the conveyances were made in fraud of the dower right .of the widow, therefore they were void as between the said M. H. Martin and sons, Joseph H. and Madison. The question still recurs, whether, in contriving to' procure the said M. H. Martin to execute the deed to defeat the rights of the widow, the said Joseph H. also contrived to have the conveyance so made as to exclude all the other children and grand-children, except Madison and himself, from participation in the real estate; and whether, in so doing, advantage was taken of the imbecility, or the uneasy and disturbed state of mind, of his father.
In view of the facts that this was a transaction between the father and his sons, and that the father was *650 very old and much enfeebled in body and mind, from age and protracted disease, and that defendant, Joseph H., was acting for his father in the transaction, and that he was at the time uneasy and troubled about his separation from his wife, it was incumbent on the defendants, Joseph H. and Madison, to show satisfactorily that it was the wish and purpose of the father to exclude all of his descendants except themselves, from the enjoyment of his. property. No attempt is made to relieve themselves from this suspicious circumstance. It was the more incumbent on them to remove any unfavorable inference from this circumstance after complainants had proved by at least three witnesses that soon after the execution of the deeds the old man spoke of the papers he had executed as being “some thing like a will.” One witness, Jane Gibson, proved that she saw her father the same day the witnesses and J. H. Martin came to town to have the deeds probated and registered. He told her he had made some thing like a will. . About the same time, he said to Moses Moore “that they run under me at the shop the other day; I thought I was signing a will instead of a deed.” The proof of like declaration at other times, is made by other witnesses. This evidence tends to excite doubt as to whether the old man really understood, when he executed the deeds, what their legal effect was; and it rendered it the more incumbent on Jos. H. and Madison, who had acted as his agent in having the deed written and witnessed, to explain by clear proof, that the old man was not imposed upon as to the character of the papers. The inference that we draw is that when the old man made the deeds *651 his attention was absorbed by the leading idea of fixing his property beyond the reach of his wife, and that having confidence in his sons, and they having procured the papers to be drawn, and having brought them to him for his execution, he signed them, supposing that they were only a will in their legal effect.
It is in proof that the deeds were prepared privately by an attorney at his office in Jonesboro,, in the presence of Jos. H. and Madison, and that the old man Martin was not .present; the door of the office was locked whilst they were being prepared. It is in proof that the deeds were written some time in June, 1866, but that they were ante dated to September, 1865.
This fact is charged in the bill as evidence of fraud, and defendants called on to answer. ' The only response made is, that “as to the dates of the executions of the deeds and of their probates and registration, he neither admits nor denies, as said deeds are not on file ; but being exhibited with the bill, refers to the dates thereof for legal evidence of said facts.” This response is not only evásive, but it suggests that the deeds bear their true dates, which is clearly proven not to be true. Whether the deeds were ante-dated so as to ■ show a date of execution prior to the marriage of the old man, with the hope thereby of defeating the wife’s alimony or dower, or whether because, in September, 1865, the mental condition of the old man was better than in June, 1866, it is left to conjecture. But, taken in connection with the evasive answer, the conclusion is irresistible that the deeds were ante-dated for some purpose, which defendant, Jos. H., deemed it best not to explain.
*652 After the deeds were prepared, they were taken by Jos. H., and in the course of three or four days, he met with Mr. Shipley on the public road and asked him to go with him to M. H. Martin’s blacksmith shop and witness the deeds. He did so, and on the next day he and the other witness, young Michael Martin, in company with Jos. H., went to town and proved the deeds. This was in June, 1866. Witness Shipley says he read the deeds over in the hearing of the old man, and he talked sensibly about some of the old corners and lines of the deeds. Witness thought the old man was in his proper mind. The other subscribing witness being dead, was not examined. Several other witnesses testify, that in June, 1866, the old man’s condition of mind was so enfeebled and disturbed that they could not regard him as capable of making a valid contract. They detail instances of eccentricity, both in his actions and conduct, which look very much like the talk and conduct of one partially deranged. But, upon the whole, we conclude that, at the time the deeds were executed, he had sufficient capacity to make a valid contract, if his mind was free from excitement, and uninfluenced by fraudulent appliances or devices. The proof is abundant that, for some time before the deeds were made, he- was uneasy and disturbed on account of the separation from his wife.
It is also in proof, that, at that time his health was much impaired. His uneasiness and disturbance of mind were evidently produced by his apprehension that his wife might become entitled to a portion of his land. In this condition his son, Joseph H., came to *653 his relief. He becomes his agent to defeat the consequences which were disturbing him. He applies to a lawyer, and has the deeds prepared. Their is no evidence that this was done at the request of the old man, or that the old man even knew what was being done by his son. He has the deeds drawn covering all the land, and much the largest share is to be conveyed to himself. At the same time, he has a bond drawn, to be signed by himself, by which he agrees to support his father, and this is made the main consideration of the deed. It is not shown that the old man even knew that such bond was to be prepared. It is in proof, that, after the deeds and bonds were executed and delivered, the old man said he had a bond on Joseph H. for his support; that Joseph H. had the advantage of him — that he might throw him out any day. This bond for support was part' of the plan of Joseph H. for forcing the execution of the deed. At the age of seventy-six, and in the bad health of the old man, the bond with the penalty of $2,000 Avas but a nominal consideration for the land. The old man lived only about two or three months afterward. It shows that Avhilst Joseph H. was arranging to defeat the old man’s Avife, he was also arranging for his own advantage. He procured the deeds and bond to be ante-dated, and then procured their execution. As he was the active agent in procuring the • preparation of the papers, and in having them signed and witnessed, and as he was to be largely benefited from the transaction, the laAV presumes from the relation of father and son, of principal and agent, that the latter had influence over the former. *654 Express proof of influence need not be made, it is implied from the relation. But when to this is added that the father was far advanced in years, was greatly enfeebled in body and mind, actually verging upon mental incapacity,, and was greatly troubled and uneasy in his mind, and that the 'son and agent uses his influence in procuring a deed which secures to himself more than two thirds of his father’s entire estate, and to his brother the residue, to the total exclusion of two sisters and several grand-children, the law raises the presumption of fraud, and this presumption can only be ■ overturned by clear and satisfactory proof that the son and agent dealt with entire fairness and good faith in the transaction. It is incumbent on him to show affirmatively, that his father comprehended fully, the purport and effect of the conveyances, and that he executed them freely and understandingly, knowing that he thereby divested himself of ■the absolute title of the lands, and that they would not operate merely as a will. No such proof is made or attempted to be made, and for that reason, the presumption of fraud must stand.
It follows that the Chancellor’s decree will be re-‘ versed, and decree made giving the relief prayed for.